Shift, Your Honor. Russell Beatty for the Plaintiff Appellant. Russell Beatty? I've got the wrong name down here. OK. This case raises one legal and constitutional issue. Failures to comply with Federal Rule of Civil Procedure 23-A-4. Adequate representation by class representatives and by class counsel. The case presents four defects under 23-A-4. Any one of them would be sufficient to require reversing. All the law necessary for this case, or all four defects, can be found in two Supreme Court decisions. The Amchem decision and the Ortiz decision. And if you'd like to skip all the long lists of other cases we both have in our briefs, I think you could fairly do that to both of us. The four defects are this. The Supreme Court and others have said flatly that one counsel cannot represent a class against a defendant and represent, as lead counsel, another class against a defendant. Flat prohibition. One counsel may not represent two classes suing the same defendant. Which of those cases, Amchem or Ortiz, holds that? The clearest language, Your Honor, can be found in Ortiz. Quote, an attorney who represents another class may not serve as class counsel. 527 U.S. 856. There are other cases in lower courts that hold that. Sullivan and so on, which are cited in our brief. And let me make one thing clear also. On this issue of lead counsel, lead plaintiff, particularly now that the PSLRA has taken control of that issue, there are, quite frankly, cases all over the lot. And if the court wants to be able to write an opinion making any determination at once by flipping a coin, I guarantee you'll be able to find support for it somewhere. I want to make sure I understood the import of your statement. Are you saying that there are cases in conflict with what you just quoted from Ortiz? Is that what you're telling me? Other decisions hold to the contrary. Most of them were decided before Ortiz and Amchem. One or two were decided afterward. And of those, one or two are reasonable and proper because although there are two classes, the classes are essentially the same, the claims are essentially the same, and there isn't any conflict. Of course, the operative principle in prohibiting counsel from representing two classes against a single defendant is that he can't be arguing on behalf of two clients, trying to settle two claims differently, and so on. And under your argument, at what point does the problem arise when they're trying to split up the 122? Does it arise before then? We raised this issue when the complaint was first filed. I understand that. And it arises at the very beginning, Your Honor. And there are cases that say that. Why is there conflict at that point? That is to say, aren't their interests parallel at that point? Because what they end up with is a big lump sum, and it seems to me only at the time they're trying to figure out how to divvy up the lump sum between the two classes of plaintiffs does the conflict actually show up. It shows up as soon as the case commences, because as soon as counsel begin to make tactical choices, they are confronted, not in every case, but in many cases with the idea that they must make a timing choice that is advantageous to one class, disadvantageous to the other. They must emphasize some discovery, de-emphasize other discovery. They must make all of the ordinary tactical choices that any trial lawyer makes as he readies his case for trial. Those are abstractions. They're generalities. Tell me how, in this case, there was conflict by having one counsel representing the 14A and the 10B people at the same time. What's the conflict? The fraud's the same. The omissions, the misstatements are the same, aren't they? No. If you look at the complaints, notwithstanding the fact that you're told in the brief for the plaintiff's appellees that the complaints are the same, they're not. If you look at the front end of the false statement pleadings for Thurber, the 10B claim, you'll find a great deal of verbiage devoted to a press release issued on February 2, 1999, which has absolutely nothing to do with the 14A claim, which is a March 15 claim. Proceed then through the Thurber complaint to the end, and you'll find two-and-a-half sections, very long sections in the complaint that deal with post-March 15 public statements by Mattel about Mattel, which have nothing to do, once again, with the learning company and the acquisition, which took place on March 15. Bear in mind that the acquisition by Mattel is a snapshot acquisition, that is, to determine whether or not the information given to the shareholders of the two companies in the proxy statement was appropriate, you look at March 15 and only March 15. For the fraud claim, for the false statements to the shareholders, you start on February 2, 1999, and you go to October 1, 1999. What degree of overlap is there between the two classes, the 10B and the 14A claim? We wish we knew, Your Honor, and then we could answer a lot of other questions that we can't answer. But we don't know. We assume there is considerable overlap. But the fact of the matter remains that they are not identical. I understand that. What's the relief? In other words, set the whole thing aside and start over? Or only worry about the division of the money? Neither one, Your Honor. In the middle? And there are several ways to look at this. We are here on behalf of the proxy claimants, as we have been from the day the very first complaint was filed, and ours was one of the very first. No one has complained about the procedure or the proceedings on behalf of the fraud claimants. No one objected to the settlement on that basis. No one appealed here. So you really only have the proxy claim before you. Is there anyone else who objected on behalf of the proxy claimants? Anyone besides you? Not as far as I know. I believe there may have been some other minor objectants who objected to lawyers' fees and things like that. But that's standard and insignificant. And certainly before us, you are the only objector. I certainly am. I'm sorry. The answer to your question, Your Honor, is this. If a court feels that it must, on its own motion, under its plenary powers, to supervise lawyers' activities before it, conflicts and so on, then it could look at the entire thing and send the entire thing back. That's not why we're here. We're here on behalf of the proxy claimants, and we think we're the only ones who have standing. And whatever result the court produces here, we would be the only ones who had standing to complain about it after that. Therefore, our view is that you should leave the 10B settlement the way it is, without objection. That you should review the proxy claim, reverse its approval by the district court judge, send it back for the appointment of new lead plaintiffs and lead counsel, and for prosecution to a resolution. Now, in theory, all the discovery for that claim is finished, because both cases were ready for trial at the time they were settled. At least that's our understanding. We had some considerable difficulty getting any information about anything, but we believe that discovery was pretty much finished. How can we leave the 10B alone, given that there was a lump sum settlement of $122 million, which was then divided equally between the two classes? What's leaving the 10B alone mean? It means you're taking the viewpoint of the people with the green eyeshades and the sharp pencils in Washington. You're disposing of that case and sending the other back, because somebody complained about it. But if your question, Your Honor, is... No, attach me a number, then. I mean, do we say you get $61 million, no more, no less, and we send back the 14A to see whether they can do better than 61? Yes. Does Mattel stipulate to your solution? No, absolutely not, Your Honor. Well, of course. Then what you're saying, forget about whether Mattel would be happy with saying 61 settles the 10B, because they probably settled the 10B and the 14A for a lump sum of 122 as a whole package, right? Yes. Right. So you're saying to them, well, you're going to get settled $61 million paid for the 10B claimants, but we're going to go to trial on the 14A, take back the other $61 million, and see what happens. Mattel would say, but just a minute, we had a global settlement. Either we had everything or we had nothing. That's not necessarily so. They had a two-part package in one undivided lump sum. Our view is that was improper, top to bottom. Well, but Mattel doesn't think so. Of course not. According to you, right? Is anybody here representing Mattel? Not as far as I know. There's no such stipulation now, is there? That is correct. You'll get your chance. Pardon me for calling you, but I just wanted to straighten that out. Let me get back to where I was, Your Honor, if I'm still trying to answer your question. I think in the absolute truth sense, Socratic absolute truth, the correct result is to send the whole case back. Disable lead plaintiffs that are here. Disable lead counsel that are here. The district judge should start all over again at the beginning. All discovery should be turned over to new lead plaintiffs and lead counsel, and the case should be, and everybody should have a chance to say, I'm satisfied. Give me three months and I'll be ready for trial. I don't need any more discovery. Are you now content to be in federal district court in California instead of Nebraska? How far back do we go? You go back to the point at which the lead plaintiff's lead counsel motion should have been made and make it. And would I rather go to Nebraska than back to the judge in Los Angeles? I would rather go to Nebraska, Your Honor, but I don't think that's an issue that's before you, I think. Well, that's enough. I don't have to explain that. You're a strong person if you'd rather be in Nebraska than California. Good hunting. One, I was trying to answer one question. There are cases that say, that hold that tactical decisions made while representing two classes disfavor one class, favor another, and that in itself is insufficient, is a sufficient grounds for denying counsel the right to represent two classes. Then there are other decisions. There are several different kinds of decisions. They all deny counsel the right to represent two classes. Another one is that they look at the defendant and they say, well, okay, if the claim for relief by the two classes together exceeds the liquidation value or the net assets of the defendant, you can't have that, so we'll have separate counsel. Another series of cases says that if you look at the thing practically, and you can do that here, if there is a fund, even an internally created fund by the defendant, that he is allocated to the disposition of the case, and the two claims exceed that, you can't have one counsel representing two classes. You need separate counsel. And there are cases that specifically hold that. There's a Syracuse University case in which separate classes were required for female softball players and female lacrosse players on the grounds that the athletic budget deemed to be a fund was insufficient to take the claims of both. The point really is, Your Honor, that whatever rationale you take, is not proper to have one counsel representing two classes suing the same defendant at the same time. It simply doesn't work. You end up with tradeoffs. Now let's come back to the other question that I haven't answered, which is, when did it really happen here? We were not involved in the discovery, so as hard as we tried to find out what was going on, we couldn't. So I can't tell you anything specific that happened in the discovery that I thought was unreasonable or unfair to either class. But it's obvious at the end that one group of lawyers worked out a global settlement for two separate claims. I've never seen that in my life, and I've handled many, many, many multiple claims, situations, mass torts, and so on. And I've never walked out of a meeting where I was dealing with 90 or 100 plaintiffs, individual lawsuits, without a piece of paper that had plaintiff's names and a dollar amount after the name. I never walked out of a room that had 91 plaintiff's names and a line and a single amount at the bottom. It's not up to a plaintiff's lawyer to divide the money up among his clients. It's up to his client to agree to accept a certain amount of money to settle the case. Is there something unusual about class actions which differs from personal injury litigation? Absolutely not. It happens all the time. One attorney represents, for instance, a family in which one person has been killed and one person has been injured and one person has been slightly injured and one person has been injured at all in an automobile crash, and they get together and they settle the case and they sit down and they allocate the amount. And one attorney represents all of those folks. It happens all the time. I'm smiling, Your Honor, because Mr. Miller and I have been playing that back and forth in the hypothetical of a cab accident. Somebody crippled and somebody with superficial cuts and abrasions. Plaintiff's lawyers in those situations don't settle for gross amounts. They sit down with their clients and they say, here's what you can have. Suppose there's one pot called the insurance policy. You've got a $100,000, $300,000 policy and they have a $300,000 pot. And that is the gross settlement. And that happens. That's exactly what happened here. It happens every day. I mean, it wasn't so long ago I was approving those one after the other. Well, let's look at the reality here. That's exactly what happened here. The plaintiffs will tell you this is a magnificent settlement because they actually even got more money than the policy. That's not what happened. They got the policies. And they got $22 million. And they got $22 million that represented the amount due from a bankrupt insurer that was made up from other sources. So what they got was the policy limits. That's the pragmatic fund that I was talking about before, which is no more proper than two claims exceeding the net assets of the company. Well, in your – I'm sorry, Your Honor, if I could just finish this one last point. In your situation involving the – or mine – involving a cab accident with several members of the family with different injuries, if you try this out on people and on numerous different people, the response will always be the same. You have a $10 million insurance policy. You have one person who's hurt really badly. They want $6 million. You have another person who's a chondroplegic, and she wants $20 million. And you have cuts and bruises, and he'll take $10,000. What does a lawyer do? Get separate counsel for the other people. And that's what should have happened here. It should have happened in the beginning. But under Rule 23, it's perfectly proper, and the Supreme Court says this in both Ankh-Amanorte's. If the problem comes up later, Rule 23 provides for adjustments to take care of the problem. Adjust the counsel situation. Adjust the class representative situation. Which is my question and I think Judge Nelson's question. Why is the problem present, if at all, before the time you're divvying up the 122 between the two classes? I can't tell you that because I wasn't present during the discovery. But every lawyer knows that he makes decisions, tactical and otherwise, tradeoffs and otherwise. We're back to the same answer we got before. Why don't we hear from the other side, and then we'll give you some time in rebuttal. You've got 47 seconds, but we'll give you a little more than that. Thank you, Your Honor. Your Honor, may it please the Court. My name is Marion Rosner. I'm a partner in the law firm of Wolf Popper. And we're the court-appointed attorneys for the DUSA class, the appellee on this appeal. As a matter of housekeeping, I wish to advise the Court that we've agreed to divide the argument in time with defense counsel and to allow defense counsel, who represents Mattel, five minutes of our time. So you'll do 15, they'll do five. Try to keep track of the time. We'll try to help. I will try. And if we can get the clock started, there we go. I don't know where to begin. Okay. Okay. This $122 million settlement has been held up for a year and a half by the lone objection of one person, Mel Schiff, who owns 30 shares of Mattel. The appeal may be filed in the name of Mr. Schiff, but I submit that the real appellant here is Mr. Beattie. Mr. Schiff has testified that he had never authorized Mr. Beattie to do anything. He was unaware that he even used his name to head the so-called Schiff Group that previously moved for class certification with 147 unrelated persons who had a small interest compared to the elite plaintiffs in this case. He also testified that he never authorized him to move on his behalf to be elite plaintiffs. In fact, at the time of class certification, the Schiff Group had shifted down to three members, and two out of the three had the same extermity Mr. Beattie claims these elite plaintiffs had. They both had 10B and 14A claims, but he found that there was no problem with them, only with the elite plaintiffs appointed by the class. So he moved for class certification. Mr. Beattie. The three plaintiffs, two of the three, had exactly the same infirmity he claims these elite plaintiffs had. Both had 10B and 14A claims. So he dropped them from this appeal, and this appeal is now only, it's probably Mr. Schiff or Mr. Beattie. Now you have to testify that he didn't authorize his ostensible counsel to do anything, then why are we here? Why isn't there a motion to strike the appearances by Mr. Beattie and everybody goes home? Well, his testimony was taken at the time of the class certification motion. We did not seek to take his testimony in terms of the, his objection, so that we only have his testimony at that time, and we can only speculate whether or not the appeal is authorized. We cannot say for certainty that it is. This judge, Judge Belzer, lived with this case for nearly three years of contentious litigation. She issued 16 pages of detailed findings, which Judge Villa pointed out is so crucial for appellate review. She heard and listened to every one of Mr. Beattie's objections umpteen times, including twice by this Court, and she rejected them in their entirety. In fact, when Mr. Beattie demeans her objections as just rubber stamping approval of a settlement, and fails to cite the Supreme Court case, the Anderson case, which holds that the findings of the judge, even if submitted to her, when adopted by her become her findings, are entitled to great weight. So we have a judge here who had every opportunity to understand or try to understand Mr. Beattie's argument, gave careful consideration to them, and rejected them. Now, this is a case under the PSLRA. We're not dealing with Aiken. We're not dealing with Ortiz. We're not dealing with a class of future plaintiffs who may or may not be injured. Roberts. No, but you're not saying those cases are irrelevant. They would have been under the statute. Of course not. If there's a conflict, then there's a conflict. What I'm saying is that in this case, there was no conflict, as Judge Belzer found, and that was for numerous reasons. First of all, it was not true. First of all, there are numerous cases after Aiken and Ortiz, such as the McKesson case and Sending case and Shorebeam and Enron and others, all of which hold that under the PSLRA, one single plaintiff can assert various claims even where there are different varying standards of proof. You said one single plaintiff. One single plaintiff.  We have two groups of plaintiffs. In fact, we do. And the question is whether or not you can have a single counsel representing two distinct groups of plaintiffs. But we didn't have two single – we didn't have single counsel. We had two counsels. Okay. Now explain that, then. Okay. Although the judge found that there was no conflict, out of an abundance of caution, she appointed my firm to have primary responsibility for the 14A claim. So, in fact, there were two counsels.  And essentially, she – well, Mr. Beattie claims that we were just – didn't have work between us. We took our role very seriously. And Judge Felser found that Will Popper zealously represented the interests of the class as we did. Now, Mr. Beattie's contention, which we showed time and again was erroneous, was that there was, in fact, not a simple negligence standard for the DUSA claim in this case. And when Judge Felser referred the case to mediation, the mediator, Mr. Bauke, served as both discovery master and as the mediator. He understood what Beattie refused to understand, that within the 14A DUSA claim, not any 14A claim, but the case before the court, there were varying standards of proof because there were varying statements in the case. For example, the judge had previously ruled that some of the statements were forward-looking, and under the PSLRA, that there was an actual knowledge standard. We had asserted a claim that the statement in the proxy that the merger was unfair was governed by Virginia bank shares. In that Supreme Court opinion, there was language of necessity to prove subjective falsity, clearly something higher than negligence. And there were risks and defenses available in the DUSA case that were not available in the THERPA case, the 10B case. For example, they had the right to rely, and they did, on Goldman Sachs, which gave them an fairness letter that their due diligence and the merger was fair. And also, they had the right to rely upon Price Waterhouse, which had given TLC a clean-ordered opinion. Even when we moved to get the special review of Price Waterhouse documents, we and our accountants could not uncover any material omission or mistake in the audit or in the work papers. So that Judge Felser, in her ruling, which you can find at paragraph 40, found that the allocation between two classes was fair and reasonable based upon her assessment and Mr. Botley's assessment of the strengths and weaknesses of each case. So that THERPA may have been a 10B case, but it had more statements. It had a longer class period. It had more damages. And it also had its own problems. It had causation problems. It had damage problems. And so giving, I guess, rough justice to both claims and after mediation, which we turned to the mediator, and he assisted us in arriving at the allocation. At what point were the two separate firms appointed, your firm and the Lorac firm? The very beginning of the case. Throughout the case. And while Mr. Beatty says here that the conflict existed all throughout the case, in his brief he says quite to the contrary. He says that if there was a conflict, it arose no later than the allocation stage. And I'm looking at page 15 of his brief. So we had a district court who is totally familiar with the facts, the issues, the strengths, the weaknesses of the case, who had babysat this case throughout its years of contentious litigation, and there is absolutely no way that this court, the district court, abused her discretion in deciding that both the settlement and the allocation were fair and reasonable, and there was no actual or potential conflict of interest, either in the part of the lead plaintiffs or the class. This is a makeshift argument by disgruntled attorney who failed to get control of the case, either by through his motion for lead plaintiff or by his class certification motion. And the notion that we should throw out the baby and start again is simply ludicrous. Equally untrue is his contention that he wasn't involved in the discovery in the case. Well, as Judge Felser found in her findings, he had access to all of the transcripts that were sent to him. He was on Wolf Piper's service list, and if he had chosen, he could have gotten himself involved in the record in this case. He chose not to do so. He just chose to come to court time and again and make the same argument verbatim that there is a conflict of interest and that the 14A case, notwithstanding all the factors I've discussed, is simply a negligence case. Even in his briefs, he never once tries to distinguish what we said. He keeps saying over and over and over again that this is a proxy case that's easy to prove. The Thurber case was a different case, and ipso facto, the Thurber, the Dusa case should have gotten more. And I will point out that, in fact, while the dollar amount may be equal, the per share amount is more for the Dusa class because there are less members in the Dusa class. So that essentially, per share, the Dusa class members are getting more. Now, I want to turn briefly to the issue of the discovery that Mr. Beattie sought. Because he could not come up with that. Can I back up for just a minute? I understand perfectly, and I saw on the record, that the per share amount was different. What about settlement amount as a percentage of share value? Well, that's to say you give me 50 percent, so you give me 50 cents per share on $100 per share value is different from 50 cents a share on a $50 per share value. That's correct. Yes. So is there something in the record that tells us what the per share value was? I didn't notice, Your Honor, in terms of what the per share amount is expected to be. I mean per share. I mean stock market valuation, not settlement value. Yes. Yes. Okay. Thank you. Finally, if you wish, I will go into the request for discovery, which was denied on three grounds. One was privilege, which is an important federal mediation privilege, which this Court pays great deference to. But more importantly, Mr. Beatty failed to make any factual showing whatsoever as to whether or not the settlement was fair. All he came to do at court is say it's unfair. And under Loebetz, which I know that this Court is familiar with, one must first make a factual showing independently to show that a settlement is unfair to get discovery. And I might say that the mediation and its allocation and the reasons, therefore, were not cloaked in secrecy, as Mr. Beatty claims. It was set forth in the declarations of counsel, which were unfiled with the Court. It was set forth in the notice, and it was fully disclosed to the class members. As the judge pointed out in the findings, this notice went to 187,000 members of the class. And only Mr. Schiff objected to either the settlement or to its allocation. She thought that was noteworthy, and in fact it is. These are sophisticated class members who have the wherewithal and the way to assess fairness of settlements, and if they have any problem with it, they are not shy to lodge their objections. As one final point, I want to point out that we previously moved to expedite this appeal on the grounds, many of which are cited here, that this appeal is frivolous and that the appeal has been held up for one and a half years. This Court granted the motion, and we would urge the Court to do so and move promptly, affirm the trial court, and get the class their money. Thank you. Thank you. Thank you. I saved you seven minutes. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Jim Rutten. I'm with Munger, Tolles & Olson. I represent the defendants who are also appellees. We agree with the plaintiffs for the reasons that they've articulated, that there was no disabling conflict here. The judgment should be affirmed in its entirety. Further, it's our position that even if the Court concludes there was a conflict, that even if the Court were to conclude it somehow affected the allocation of the global settlement fund as between the two classes, the Court should make clear in its opinion that on remand the only thing that would have to be revisited is the allocation. Could you, maybe you're in a position to tell us maybe not, it's just been represented to us that whatever conflict there might have been was taken care of by the two different law firms representing the two different classes. Yes or no? I would agree with that. I think that's one factor that takes care of it. There are a number of factors here that I think show there was no disabling conflict. That's one of them. From the very beginning when the Court appointed lead plaintiffs back in early 2000, I guess it was, she assigned, Judge Bowser assigned, primary responsibility for litigating the 14A class to the Wolf-Pauper firm. And I would just say, based on my own experience, and I think this is borne out by the record, they took that responsibility very, very seriously and zealously advocated for that class throughout the case. And they represented only that class throughout? They were officially counsel of record for both classes, as were the other attorneys that were on the so-called executive committee that led the litigation. But they were assigned primary responsibility for the 14A class. In my experience, when something was filed in the Thurber case, it was the 10B case, it was the Milberg-Weiss firm that was all over that, something was filed. In this case, the 14A case, I was always dealing with the Wolf-Pauper firm. But they were formally designated as representing both classes, both firms were? That is correct. That's correct. Well, that's odd. I haven't seen it before, but as I said, they were given a specific area of responsibility and they followed through with that. And it started out with the Milberg firm and it ended up with the Lorac firm after that firm split. Is that what happened? That is what happened. The split occurred while this appeal was pending. I'm not sure exactly how that's all going to get sorted out on their end, but that's what I would assume would happen. Was there an uneven division of counsel fees between Wolf-Pauper and Milberg-Weiss or Lorac as it eventuated, or do you know? That's a question I don't know off the top of my head. My recollection is that there was – I don't want to speculate. That should be in the record, I believe, in Judge Fowler's findings of that in the conclusion of the law hearing. Ask this issue of what happens with the allocation, the court finding conflict after the allocation. I think it's important to keep in mind that the sequence of events here, precisely when Appellant really does contend this so-called conflict manifested itself. There were two negotiations, one between the plaintiffs and the defendants at which the Global Settlement Fund was agreed to, and one that occurred afterwards among just the plaintiffs at which the allocation was made. Appellant does not argue anywhere in his papers that the two plaintiff groups had divergent interests at the point of negotiating the global settlement. He doesn't argue that that global settlement negotiation was in any way affected by conflict of interest. He certainly doesn't argue that that $122 million amount is in any way inadequate or unfair. Nobody has ever argued that, not Appellant, not another class member, not anybody. Except today. Except today we heard some statements that might be heard to suggest that. I'm not sure he quite said that, but there's some ambiguous statements there. He does argue that the interests of the two plaintiffs diverge at the point of what he calls the allocation mediation, and that's clear from his brief. For example, on pages, his opening brief, on pages 28 and 29, he argues, and I quote, once the class representatives had created a single settlement fund, the representatives in Dusick and the representatives in Thurber who were the same had conflicting interests. So he's arguing once that fund was already created, then there was conflicting interest. On page 20 of his opening brief, he points out a global settlement was reached and then argues, quote, and then the executive committee abandoned its responsibility to give the proxy class independent, vigorous representation. Again, he's only saying once the settlement fund was created, only then did the interest truly diverge. And I would speculate if there's a reason he doesn't argue that the conflict affected the first negotiation, and it's because the case law refutes that notion. The corrugated container case from the Fifth Circuit that we cited is really on point. In that case, you had what ultimately became two subclasses that were represented by the same lawyers that negotiated a global settlement with the defendants. An objector argued the Fifth Circuit should reverse the settlement because the attorneys had a conflict. The Fifth Circuit said no. The Fifth Circuit said at the point the two subclasses were negotiating with the defendants, their interests were entirely aligned, and that interest, of course, was getting as much money as they could out of the defendants. And, in fact, the Fifth Circuit noted, I'm about to change course if I might. You've used your five minutes. I wouldn't mind asking Ms. Rosner a question or two based upon your description of both firms as a matter of formal record representing both sides. So would you mind ceding back to Ms. Rosner? Thank you. You understand the question. As a formal matter, you're actually representing both groups. Is that correct? That's right. Well, yes and no. You're counsel of record as to both groups? We're counsel of record as to both groups. But in practicality, the Delosiers headed up the 14A class. They had the largest financial interest of the 14A losses of anybody in the group. Now, I confess I have much less experience with this sort of litigation than some people, but this is the first time I've heard of somebody representing one part of a class but actually, as a matter of record, representing both. Well, Your Honor, maybe if I can explain the background. We decided not out of a conflict but as a matter of strategy to file two separate complaints. And the Delosiers were on the 14A complaint. The Birmingham was on the 10B-5 complaint. We did this not because of a conflict, because we knew that they centered on the same fraud or not fraud. But there is a conflict that finally shows up when there's a lump sum and there are two different groups, both who would like as much as they can get. Isn't that right? We don't believe that there was a conflict once it was mediated by. No, that's not really my question. What you're trying to tell me is the mediator's involvement took care of problems. I have a different problem, and that is once there's a lump sum of $122 million and that there are two plaintiff groups, both of whom have a claim as to some amount of that, there seems to be a conflict between those two groups. Correct? No. No? No. Why not? Because they both want as much as they can get. It's a zero-sum game. Because they both we wanted as much as we could get because we knew it would affect our fee. And our clients wanted as much as they could get because they had more to gain on the 14A side than on the 10B5 side. We wanted more money than we actually got through the Medusa class. I don't think we're meeting our minds yet. We have two groups. There's the 10B group and we have the 14A group. There's some overlap between the groups. Some people are members of both. But there seems to me a direct conflict of interest between the two groups once the $122 million has been arrived at and the only question is how do you divide it? Isn't that right? What am I missing? The district court found that there was no conflict. Okay. You and I, there's a dollar that we can split between the two of us. Right. Do we have a conflict as to how that goes forward? Converging interest. There you go. I want more than you do. If you want to call that a conflict, we call it a conflict. Okay. You can call it a diverging interest. We had diverging interest. There you go. We wanted more. They wanted more. There you go. We both argued for more. But why did you maintain a formal lawyer-client relationship with the side that you say you're arguing against? Your Honor, I submit that one plaintiff could have represented both 10B and 14A classes without their need for separate counsel. I see. So in other words, what you said before when you say there were really two different firms representing, that's an unnecessary argument in your view. Yes. Yes. I'm saying that Judge Felder did that really out of an abundance of caution. She found that ---- But she didn't do very much if she left you counsel of record on both sides. That is to say, to the extent that you're representing the interests of the 14A class at the expense of the 10B class, you're working against somebody for whom you are counsel of record. Well, as a practical matter, now let's look at form over substance. As a practical matter, we worked exclusively for the 14A class, not for the 10B class. Our job, which she found ---- Why did you then keep counsel of record status as to the 10B class? It was a mistake. Maybe it was a mistake. Maybe we should have changed the order in taking this off there. But as it worked, and as it worked in practicality, we were the counsel for the 14A case, and the delosiers were the lead plaintiffs for the 14A case. And there was no conflict because each side had the same interest in proving the most culpable conduct. But you're slipping off the question. It seems to me there clearly is, you want to call it a divergence of interest, I would call it a conflict, once you've arrived at the $122 million lump sum. If you want to call it a conflict, I will not disagree with you. But I would say that the conflict was remedied, if it existed at all, by the mediation, by a neutral arbitrator who listened to both sides, who had no interest in one or the other, and who helped the parties reach the allocation. At that point, any conflict which existed ---- How does the involvement of a mediator help resolve a conflict if, now take this as a premise and not as a concession, if the lawyers in front of the mediator are simultaneously representing both sides? But, Your Honor, as I said ---- I mean, it might have been the mediator's view that this was fair, but he's not working for either side. We may have been counsel on the executive committee. In actuality, we wrote the complaint. We wrote the motions. But you're now backing away from your argument that the mediator involvement solved it. Because I don't see how the mediator helps it one way or the other. I mean, if there's a conflict and you're representing both sides at the same time, the fact that the mediator gets involved, I think, is neither here nor there. In practicality, the Wolf-Pauper firm worked exclusively for the Deucer class, and the Delosiers worked exclusively for the 14A case. But what I hear you're saying is that the apparent joint representation created an apparent conflict, but practically what went on behind the scenes was that the two firms worked exclusively for their group. Absolutely. Without regard to that piece of paper that says they represented everybody. Absolutely. You said it better than I can. Okay. And also, given the fact that the district court knew about this for years and years as she directed the litigation, what is our standard of review? Is it abusive discretion? Absolutely. Thank you. That was helpful. Thank you. Mr. Bailey, I think you've got a minute or so. Your Honor, what you've heard here is the arguments that have been made repeatedly at every level. That is, if you can pass the Rule 23E fairness hearing, it doesn't matter what else happened. It all gets scrubbed and flushed. That, if you will please go back and read Amkam and Ortiz, you will find a half a dozen categorical statements that that is not the law. For example, settlements fairness under Rule 23E does not dispense with the requirements of 23A and B. Clear-cut holding in the case, not dictum, holding. Nor can the class approved by the district court satisfies 23A-4's requirement that the named parties, quote, will fairly and adequately protect the interests of the class, unquote. The adequacy inquiry under 23A-4 serves to uncover conflicts of interest between named parties and the class they seek to represent. Okay. We've read the cases. That would be 25 seconds for any concluding remarks, but we've read the cases. Okay, Your Honor, not all courts are the same. That's the first time I've read from a case in my entire career. Let me just simply make one point. What you've been asked to do here is to look the other way. A lot of money, it's not. It's a lot of money, so it doesn't matter what happened. But it really does matter, and here's why. Because the people who were involved here before you are the perpetrators of things like this over and over and over and over again, all over the United States. Okay. I make a career of resisting them, and that's why I'm here. Thank you. Thank you, both sides, for your argument. The case is now submitted for argument or submitted for decision, and we are in adjournment until tomorrow morning at 9 o'clock. All rise. The court for this session is adjourned. Thank you.
judges: T.G. Nelson, W. Fletcher, Bea